We have three cases on the calendar this morning, patent case from the district court, two veterans cases, one of which is being submitted on the briefs and will not be argued. After the first case, we will adjourn briefly and then come back with a slightly altered panel. Our first case is Cheetah Omni v. AT&T and Siena, 2019-12-64. Mr. Lurie. Good morning, Your Honors. Tom Lurie on behalf of Cheetah Omni. The court should not imply a license where Fujitsu and Siena were aware of the 836 patent and agreed not to license it in the license agreement. That should be the beginning and the end of the analysis. As Judge Dyke said in his concurrence in Endo, that's inconsistent with an implied license. The knowledge of the patent and the choice not to include it expressly in the agreement is inconsistent with an implied license. As I understood Judge Dyke's dissent in Endo, it was contingent on the fact that there were negotiations for a particular patent and then ultimately those negotiations failed to yield inclusion of that particular patent into the license. And I'm curious, is there any evidence of something like that happening here with the 836? I didn't see anything like that mentioned in your blue or gray briefs, so that made me wonder. No. There was no specific discussion of the 836 patent with respect to the license agreement. The 836 patent was expressly incorporated into the covenants and in the Fujitsu case, it was one of the listed patents in the covenants, which were negotiated and signed the same day. Or negotiated at the same time and signed the same day. So in that sense, it is a patent that was identified and known to the parties and was part of the overall agreement, but not part of the license agreement, if that's what you're focused on. Yeah, as to the license agreement, was there some history as to an attempt by CNN Fujitsu to try to gain a license that was completely comprehensive as to the entire set of optical telecom patents? And then that didn't work out for them, so they were relegated to this, I guess, one chain of patents. So essentially, yes. I'd say the answer is yes. Essentially, yes. So can you please explain? I will. Specifically, what you mean by that? So in those discussions, CNN and Fujitsu wanted some coverage for the entire telecom portfolio. And the discussion was, we were only going to give you a license for specific patents, but you could have a covenant for the remainder of the portfolio. Other than the text of the covenant and the text of the licensing agreement, from which I take it you're inferring this. Is there any evidence that was presented to the court as to the negotiation, the history of the negotiations themselves? Emails, communications, and so forth? I didn't see anything in the appendix. I don't know if there was anything outside of the appendix that was presented to the court. There was very little. There was very little, or was there any? There was a little bit. It was primarily about the question of the clause that had the combination language in it. And that was presented to the court with respect to this combination issue that was discussed and resolved by the district court. But not with respect to the question Judge Chen asked. Okay. So when you say there was negotiation as to that issue, the issue Judge Chen asked about, you're relying on what? Other than the existence of different language in the covenant and the license. Well, I guess my participation in part, but I know that's not in the record per se. No, but you didn't put anything in the record from which we can infer that there were negotiations, an effort to try to include or exclude the 836 explicitly that did not result in the inclusion or exclusion of the 836. That's right. There's nothing in the record except for the agreements themselves to that effect. But the important thing is there's not a single case that holds, that creates an implied license under these facts. Not one. But we have the Endo case where, as Judge Chen points out, the Judge Dyke's comments were a dissent in part, but the part that we cite is a concurrence actually.  Concurrences and dissents are not the law. That's true. It was not the basis for the whole. It usually doesn't succeed by citing one judge's opinion. I agree. But it's the rationale that's important. It's not his opinion, but it's his point that it's inconsistent with an implied license to say where you know about the patent and you don't include it. And there's no question, and this is undisputed on this record, that Sienna and Fujitsu were aware of the 836 patent and its history and its importance because there was a Verizon lawsuit. Fujitsu was part of the settlement of the Verizon lawsuit. They were intimately involved in that lawsuit. And they knew how important this 836 patent was to this concept of the fiber to the home, fiber to the premises. I think they could have written a different agreement. They were settling 714. 925 was a patent. And 836 has all the same language and it was a grandparent, a grandchild. It does. Now it discloses several different categories of inventions. And each of those different categories of inventions is claimed differently in the various patents. And so just saying that it has the same disclosure doesn't, isn't the same thing as saying it discloses a single invention. And I think that's one of the relevant issues here. But everything in the 925 patent was claimable in 836. It was claimable in 836. Because it had the same disclosure. It's true, but it wasn't claimed. In fact, if it had all been claimed, there would have been a restriction requirement. We would have had to file divisionals. But what do you think is the underlying principle of the rule coming out of General Protect? General Protect basically says, if you get a license on a given patent, then you as a licensee don't have to worry about any continuations that might spin off of that licensed patent, given that those continuation patents share the exact same disclosure as the licensed patent. And so you don't have to worry about being chased again by this patent owner over any continuations. So it's not just a focus on claims and claim scope per se with the licensed patent. It's more about seemingly the shared disclosure that all these different patents have. Is that fair to say that's what's coming out of, that's the underlying rationale of why we have the rule that we have in General Protect? I would say no. And for this reason, that the rule, first of all, the implied license doctrine is a narrow doctrine. Several courts have said that. Nobody's disagreed with that. General Protect creates a narrow presumption. And that presumption is very specific. It says, if there's a continuation that issues from a patent that previously has been licensed, then as to certain products, then those products, not the patent, but those products are impliedly licensed. So it's not, doesn't create a patent license. It creates a license for specific products, which is important because- Regardless of the fact that the patent disclosure might actually disclose 20 different inventions. And now the continuation patents are claiming inventions 15, 16, and 17, whereas the licensed patent was perhaps merely claiming invention number one disclosed in the 20 inventions in the shared disclosure, right? That's true. And courts have criticized General Protect for that problem. But both AT&T and we agree that- Which courts are those? I'm sorry? You said courts have criticized the rule in General Protect. Which courts are those? Universal Electronics. It's a Central District California court case. Universal Electronics versus Universal Remote Control. It's Central District California 2014. And it starts on page 1074 and continues on to page 1075. What's the citation, the full citation? I'm sorry? Citation? 34F sub 3rd, 1061. All right. And everybody, both sides agree that if this was a divisional case that the rule would not apply. And that was a Northern District of Illinois case that said that. And we cited that. AT&T said, yeah, that's different because it's divisional. But that's the point. Divisionals are created because there are multiple inventions disclosed in a single application. And if it's only this procedural nicety that the party, the patent owner filed claims that were to two different inventions in the same application and therefore got a restriction requirement and therefore became a divisional, that's the rule that elevates form over substance. The point is, if you have different inventions and different scopes, then that scope is important. And Transcor made that point. ENDO makes that same point, talking about Transcor, that any implied license has to be limited to the scope of the express license that was granted. And it's about the claims. It is about the claims. And our agreement is about the claims. But the express license was to certain patents and parents. Our express license was. But the licensed products were limited to certain patent claims. And this is a fairly common way of writing a license agreement, patent license agreement. Licensed products are only those that infringe the licensed patents. I'm lost. I mean, my understanding of general protect is even if you have an omnibus specification disclosing 20 different inventions, and then you license a patent that claims only invention number one, and then you have multiple continuation patents off of that license patent that happened to claim all the other 19 inventions disclosed in that omnibus specification, under general protect, there is a presumption that there's an implied license for those continuation patents. Am I misunderstanding general protect? If you're including in that, that those continuations issued after the license agreement, no, you're not. But that's a fact. I'm just talking about timing. We're really only focusing on timing. But the timing is irrelevant. Well, I understand. But I just want, I was confused too when you were going on to discuss the role of claims and the scope of the protected products. But we're really here, if this came, put it this way, if the 836 patent had not issued prior to the agreement in this case, you would basically be out of court. Well, I would be here arguing that general protect was wrongly decided. Well, okay. That the, Okay. And understand that general protect simply, Well, that's pretty close to being out of court. Maybe.  we create a presumption from transcore. But when you look at transcore, transcore was not as broad as the general protect presumption. And there was also an additional provision in the transcore license that said there aren't any, no license should be presumed for any patents that have already issued as of the effective date of this contract. So there was that kind of express exclusion of any possible implied waivers in transcore. You don't have that here. That's true. But that's not. Also didn't have that in general protect. But that's not dispositive of the issue that general protect created. I think in the end, you, we are all bound by general protect. So the best you've got right now is the timing question. I think that's probably the best you have at this point to be focusing your attention on. Well, that's where I started. But let me read, and this is from the opinion, not from Judge Dyke's dissent in part. This is from Endo Pharmaceuticals. This is page 1377, 746, F3rd, 1371. We thus recognized, talking about transcore, we thus recognize the assertion, the assertive patent claims were broader than the license claims. To avoid a windfall to the licensee, we expressly limited the implied license to the scope of the license claims. Right. That's what. We're aware of the language in general protect. And I guess the question is, for our purposes, is it your view? What if CNN and Fujitsu were unaware of the already issued 836 patent? It'd be a different case, and you wouldn't, you have to create new law in order to capture this fact scenario. It would be a different case if they weren't aware of it. I agree with that. We wouldn't be standing here making the same argument. So it comes down to their awareness of the 836. Absolutely. They knew about it. They could have included it. They chose not to. It was their burden to put it in. They have the burden. When you say it's their burden to put it in. Now, one of the things Judge Dyke points out in his concurrence slash dissent is that the party with greater information, which is the patentee typically, is the party that bears the burden of making sure that the licensing agreement is sufficiently complete to be informative. Why shouldn't that be the case here as well? You could have put in something about the 836. Instead, you're saying it's their burden. Where do you get the conclusion that it's their burden? Well, because they're asserting the licensed defense. Everybody agrees it's not expressly in. Everybody knows that the 836 patent existed. But you recognize that Judge Dyke, on whom you've relied, took the opposite position with respect to the burden in his dissent. You know the part of the dissent I'm talking about? I do know the part of the dissent, but that was a situation where the other side didn't know about the patents that were pending in the patent office at the time and then issued later. That's a different scenario. You can't. We all agree that they knew about the 836 patent. It's not like we hid that from them. You're right. If we had not told them about it, then we would have the burden to stand to say we had to tell you about it in order for that to be a part of your agreement. But they knew about it. If they wanted it in there, they knew how to put it in there. They put it in the covenants. Why can't they put it in the license agreement? Counsel, your time has expired. I think we'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Jamieson. Thank you, Your Honors. May it please the court. The court should affirm the district court's determination of summary judgment that this suit is barred by an implied license based on the 836 patent. When you review these agreements, the intent of the parties was clear. The language was unambiguous that Ciena and Fujitsu were negotiating for complete peace for itself and with respect to its customers, such as AT&T, that they would be immune from future litigation on not only the seven enumerated patents that were the subject of the Ciena and Fujitsu litigation, but for any patents that were in those families up and down the chain, if you will. You're not asserting an express license. No, no. And to reflect the intent of the parties and the scope of protection that they were seeking, they used the broadest language that I think you can really come up with in these circumstances. Well, to cover a chain of applications. To cover a chain of applications. Particular line of patents. I mean, this doesn't cover the entire family of telecom patents. No, it covered everything in the chain up and down through the use of parents, continuations, continuations, imports, provisionals. But it didn't cover, for example, siblings or cousins of the patents in suit. It did not cover them expressly. But what we know is that... It could have been clearer. I mean, you were saying that it was as clear as it could be made. It could have been clearer. You could have been expressly covered and we wouldn't be here. I mean, I'm kind of surprised and puzzled, really, that competent counsel ended up with four agreements that have got us into court wondering what those agreements, the scope of those agreements, really is. Your Honor, in hindsight, when Chita brings a lawsuit three years after the fact against a different entity, a customer, on a certain patent, it's always easy to go back in time and make the observation that we could have covered that 836 patent expressly. Wasn't it kind of obvious when the 836 was in the covenants and it was not in the license? What was the purpose of that distinction? Presumably somebody thought about that. The license agreement covers the seven patents that were at issue and then the continuations, the continuations in part, that flowed from those patents. The covenants, as they acknowledge in the great brief at 11, is a separate agreement with separate rights and the covenants not only covered the patents that were the subject of the underlying litigation and the patents that were in the family, but the covenant actually extends to different families of patents. No, we understand. We've read the licenses and covenants, so you're describing them and we already know that already. The question, as I understand the question coming from Judge Bryson, is why is there this discrepancy? Why is there daylight in terms of the scope of coverage between the covenant not to sue and the licenses when it comes to certain patents, especially the 836? The 836 is enumerated in at least one of the two covenants not to sue. Why wasn't it likewise contemplated for express coverage in the licenses? What is the answer to the why question? Well, I think with respect to the license agreement, the why is that the parties, rather than enumerating every patent that could be covered, they use the common vernacular, parents, continuations, continuations in part in an effort to capture fields of invention and the fields of invention that were expressly covered included the 925 patent. But not the 836. It does not expressly include the 836. And I think, Judge Bryson, you asked the question, and this really is the timing issue. The claims of the 836 patent, I mean, this is a, and this gets to whose burden is it to articulate what should be in the agreement and what should be out of the agreement. But the claims of the 836 patent, they could have been appended to the claims of the 925 patent. And the 925 patent claims could have been appended to the 836 patent. But for whatever reason, CHITA in its prosecution activities, they went about it a different way. But if the claims of the 836 patent had been appended to the 925 patent, we would be expressly licensed. It's because of the whole point that the 836 is a continuation of the 925. And what the parties bargained for was complete peace with respect to fields of invention. They didn't bargain, contrary to what we heard. They didn't bargain for peace with respect to patent claims. Let me ask you this question. The issue that it seems, I think we're all in agreement, probably, on this. The key issue with respect to the licensing part of this appeal is the question of timing. General Protech seems to cover the universe of cases involving continuations, which this case involves, in which the patent that's now at issue was not issued until after the agreement. All right. This is not such a case. This is a case in which the patent was issued before the agreement. So the question is, given that the gist of the rationale in General Protech is you've made an agreement, you shouldn't be allowed to suddenly pop up with a newly issued patent and say, aha, gotcha, that you're pulling a rabbit out of the hat after the fact. But the argument made by the other side is, this is not a rabbit that's coming out of the hat. This is a rabbit that's been out of the hat. And therefore, there's no surprise. Why is that rationale not an appropriate basis for distinguishing between the previously issued patents and the not previously issued patents? Multiple answers to that question, Judge. First, in TransCore, the Federal Circuit said that, quote, the timing of patent issuances is no more relevant to the implied license inquiry than the timing of acquisition. Well, I think we can all agree that regardless of the particular phrases that are used here and there in some of the opinions, there is no opinion of this court that deals with this precise situation. General Protech deals with the not yet issued patent. This is an already issued patent. So what is, as a policy matter, the question that we're faced with is why we should extend General Protech? So other than, I know I'm familiar with the language that you quoted. I'm not persuaded that it is dispositive here. But give me a policy reason for why the same policy that animated the court in Protech apply here. Your Honor, and this gets to the burden, if you will, that's discussed in both General Protech  by Judge Dyke in the dissent in Endoforma. And you asked the question about who really is the master of the information and who really understands the patent portfolio and who understands where they're going with their patent portfolio. And there's a clear answer to that. And that's the licensor. It's not the licensee. And for example, if we take Cheetah's argument, everybody knew about the Verizon deal and everybody knew about the 836 patent and everybody knew that it existed. If Cheetah intended to sue AT&T, why didn't they exclude AT&T from the license agreement expressly? They excluded other parties. They excluded Cisco. They excluded Tell Labs expressly. They excluded other parties that they were in litigation with. Parties all the time exclude future litigants from license agreements expressly. They didn't. There are no disavows, no exclusions with respect to the 836 patent or AT&T in any of these agreements. Interestingly, the implied license doctrine existed at the time that these agreements were negotiated. If you look at the Verizon agreement, which they want you to, twice in the Verizon agreement, Cheetah has provisions that state that no implied license will be inferred from anything in these agreements. It's in there twice. It wasn't the subject of the briefing, but it was, it's in the appendix. It's the Verizon agreement appendix 776 at paragraphs 3.3 and 8.1c. They twice have a no implied license reservation of rights or disavow in the Verizon agreements. It does not exist in any of these agreements. Why didn't, why didn't Cheetah expressly exclude the 836 patent if they intended to sue on it in the future? The point is, the entity that knows where they're going down the road, it's not Siena, it's not Fujitsu, and it's certainly not AT&T, who's not even, you know, obviously at the negotiating table. It's Cheetah. So all the facts are on the table, and against the backdrop of these facts, there are no exclusions at all. And under General Protect and under Indofarma, the burden was on them. That's crystal clear. I mean, I can read all the quotes from you, but I'm sure you're familiar with them. The burden was on the licensor that if it intended to pull back from the scope of an agreement, they needed to say so, do so expressly. And that's controlling law. They didn't do it here. And that should be enough to carry the day. Do you want to talk about the covenant at all? You know, Your Honor, absent questions from the court will stand on the briefing on the covenant, but I'm happy to answer any questions that you have about it. I think, you know, well, I'll make the following observations about the covenant. It is a freestanding agreement. If you look at the preamble, the preamble makes clear that it's an agreement that's separate and a standalone agreement from the license. Cheetah acknowledges that in the gray brief. What did the covenant actually convey in your view by way of actual rights that were not already conveyed by the license? The license agreement dealt with five different families of patents that were at issue in the Siena and Fujitsu litigation. The covenant actually gets into other families of patents and it identifies them expressly. And so it gave an additional layer of protection with respect to the portfolio. So the families referred to in the license are different from the families referred to in the covenant? Well, all of the patents that are covered in the license agreement are also in the covenant, but there are additional patents in the covenant that are not part of... You mean like the 836, except for the fact that you say the 836 was covered by the implied license. Right. So the difference is with respect to the 836 is zero as far as you're concerned, because you said, oh, we have an implied license. Correct. And then we have the covenant with respect to the 836 as well. But then there are literally in the covenant, there are other completely unrelated families of telecommunications patents that are covered by the covenant that would not have fallen within the scope of the license agreement. If the license, when it defines which patents are the licensed patents, didn't say, didn't begin with... It identifies the license, that the litigated patents, the patents ensued, and then it talks about all parents and continuations and re-examinations. If it didn't say the word parents, then you wouldn't have an implied license. Is that right? Because the only way you get an implied license to the 836 is through the 925. The 925 is a parent of the 714. That is correct, Your Honor. So even though the 836 and the 714 share identical specifications for all intents and purposes, you wouldn't be able to enjoy an implied license in your view. And it's only through a different patent, a parent patent that also has the same shared specification that you get to argue for an implied license. Yeah, but to be crystal clear... Is that your understanding of endo, I guess is what I'm... Yeah, well, I mean, to be crystal clear, the use of the word parent by definition creates an express license to the 925 patent. Right. Because it is a parent of the 714. Right, you are relying on an implied license of the 836 through the express license of the 925, not through an express license of the 714. That is correct. And so if you didn't have an express license to the 925, then under endo, I assume, there's no way you could argue just by having a license to the 714 that you had an implied license to the 836. Your Honor, I candidly have not thought about that permutation. But, I mean, the way I understand general protect and the way I understand endo is that if you have an expressly licensed parent and you have a continuation from that, then you have an implied license. Do you have an implied license from, what would they be? Cousins or sisters or brothers? These cousins are twice removed. Something like that. First cousin once removed. Right. I don't think that's where the case law is yet. Thank you, Counsel. Mr. Lurie has two minutes if he needs them. Thank you, Your Honor. A couple of points I want to respond to. Counsel said that if the 925 patent had had the claims that are in the 836 patent in it, then we wouldn't be here. That's wrong. Because if the 925 patent had those same claims, we would have gotten a restriction requirement from the Patent Office. We would have filed a divisional application. And everybody agrees that that divisional would not be a licensed patent through implication. And we cited a case in AT&T. And Sienna commented on the case. It's Cascades AV versus Everts Microsystems 335F sub third 1088 from the Northern District of Illinois in 2018. And this is AT&T's statement trying to distinguish that case. It says there was no implied license to divisional, emphasizing divisional, patents, which resulted from a finding that a patent application discloses two or more distinct inventions. And that's where we're at. We have two or more distinct inventions. They're claimed separately. They have nothing to do with each other. You don't have a divisional here. We don't, but that's form over substance. It's divisional in the sense that they're separate inventions. Well, maybe it's form over substance to try to make a distinction between divisionals and continuations. It may be, but at least AT&T and we agree that those are different. This argument that you're making now about divisionals and so forth, I don't remember this being raised in your brief, was it? It was. We cited the Cascades case. They distinguished it. We made the point in our opening brief that the 836 patent has these different categories of inventions. But I don't remember you're making an argument that therefore, that that's why you should win this case. I mean, you may have made an observation. I didn't see it. True. We didn't say that, but we made the point that it's about the scope of the invention and not about the scope of the disclosure of the application. Where does general protect say that? That seems to be contrary to general protect. It is contrary to general protect because general protect doesn't focus on the claims, which transport does, as Endo points out. It's about the claim. You can't have, otherwise the licensee gets a win. Something you should be arguing to the NBank court, it sounds like. I don't think so because. Oh, we can overturn general protect? I don't think so. I don't think you need to because you can distinguish general protect. But on the timing issue. On the timing issue. Which brings us back to timing is the issue in this case. That's right. It's a narrow presumption. It should not be broadened. Cover every continuation. OK. I see my time's up. Thank you. Thank you, counsel. We will take the case under advisement. All rise.